**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS,**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JUDITH COTHRAN, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>ADVOCATE HEALTH AND HOSPITALS CORPORATION, DOROTHY ANOINA, M.D. RICHARD MULTACK, D.O., and KARISSA BURNSON, R.N.,<br><br>Defendants. | ) | Case No. 1:24-cv-7251<br><br>Judge Matthew F. Kennelly |

**JOINT STATUS REPORT**

Pursuant to this Court's Order of March 27, 2026 (Dkt. # 124), the parties respectfully submit the following Joint Status Report:

## I. JOINT SECTION: STATUS OF PRODUCTION ORDERED BY COURT

On March 6, 2026, Plaintiff filed a Motion to Compel Certain Documents Responsive to Plaintiff's First and Second Requests for Production and a Complete Privilege Log. (Dkt. # 118). On March 23, 2026, over Advocate's objection, the Court ordered Advocate to produce certain "comparator" discovery as set forth on Page 4 of Advocate's Response to the Motion to Compel,[1] and the unredacted 2022 MIDAS spreadsheet. The Court acknowledged that its order was not a final ruling on the Motion to Compel and entered and continued Plaintiff's Motion to Compel.

[1] Advocate's proposal on Page 4 of its Response was to limit "comparator" discovery to patient-safety documentation where: (1) the same supervisors/decisionmakers were involved, *i.e.*, Dr. Multack and Dr. Anoina; and (2) a physician of the same classification as Plaintiff engaged in conduct comparable to Plaintiff's complained-of conduct in the MIDAS reports. (Dkt. # 120, pp. 4-5). Plaintiff objected to this limitation because Drs. Multack and Anoina are not the only decisionmakers in this case, all physicians regardless of classification are subject to the same patient safety and disciplinary review standards, and all patient safety complaints are sufficiently similar for discovery purposes. Defendants object to Plaintiff's unsubstantiated and inaccurate assumptions, as stated.

(Dkt. # 122). On March 27, 2026, the Court ordered Advocate to produce the 2022 MIDAS spreadsheet by March 30, 2026, and the remaining documents by April 22, 2026. (Dkt. # 124).

On March 30, 2026, Advocate produced the unredacted 2022 MIDAS report in compliance with Court Order. On April 22, 2026, Advocate produced a tranche of documents and a Privilege Log for Redacted ESI production, which it claims complies with the Court's March 27, 2026 order.

Plaintiff's counsel has reviewed the production and believes it is deficient for the reasons set forth in the next Section.

## II. PLAINTIFF'S SECTION: PLAINTIFF'S RESPONSE TO COMPARATOR PRODUCTION AND PROPOSAL FOR COMPARATOR DISCOVERY

Advocate's proposal limited "comparator" discovery to patient-safety documentation where: (1) the same supervisors/decisionmakers were involved, *i.e.*, Dr. Multack and Dr. Anoina; and (2) a physician of the same classification as Plaintiff engaged in conduct comparable to Plaintiff's complained-of conduct in the MIDAS reports. Plaintiff objected to these limitations because Drs. Multack and Anoina are not the only decision-makers in this case; all physicians, regardless of classification, are subject to the same patient safety and disciplinary review standards, and all patient safety complaints are sufficiently similar for discovery purposes. The Court acknowledged on the record that it was not ruling on the scope of comparator discovery but wanted to start with this initial production and entered and continued Plaintiff's Motion to Compel in all other respects. (Dkt. # 122).

On March 30, 2026, Advocate produced the unredacted 2022 MIDAS report spreadsheet and, on April 22, 2026, it produced a tranche of documents relating to [redacted],[2] and unredacted

[2] The format of these [redacted]

versions of previously produced meeting minutes relating to [redacted].[3] Advocate claims these are the only [redacted] under the limitations set forth in its proposal.

In ordering Advocate to produce the limited comparator discovery based on its proposal in its Response to the Motion to Compel, the Court acknowledged that additional comparator discovery may be appropriate. The Court ordered the initial comparator production as a starting point to aid the parties and the Court in determining the proper scope of comparator discovery. The Court entered and continued the Motion to Compel to allow the parties to review the initial production and to report back to the Court thereafter. After reviewing the initial production, Plaintiff contends that Advocate's production is deficient and excludes highly relevant information critical to this disparate treatment race discrimination and retaliation case. This Section explains the deficiencies in the initial production and proposes the scope of comparator discovery based on a review of it. Plaintiff's counsel believes the information in this Section will aid the Court in deciding the Motion to Compel.

**A. Important Factual Context**

To understand the scope of relevant comparator discovery, some factual context is required. As outlined in more detail in Plaintiff's Motion to Compel (Dkt. # 118), Plaintiff was referred for review to the Patient Quality Steering Committee ("PQSC"), the Physician Leadership

---

[redacted] Advocate has never produced such MIDAS review reports for the purported MIDAS complaints with respect to Plaintiff. Plaintiff's counsel has requested that Advocate produce the same review report documents for Plaintiff.

[3] The exhibits to this Status Report are designated as Confidential Information or Attorney's Eyes Only pursuant to the Agreed Amended Confidentiality Order entered in this case. (Dkt. # 84). Accordingly, the exhibits will be filed under seal, and any Confidential Information in this Status Report will be redacted in the public filing.

Council ("PLC"), and the Medical Executive Committee ("MEC") (among other committees) based on 19 MIDAS patient safety reports filed against her. (See Exhibit 1, Plaintiff's MIDAS reports filed under seal). The 19 MIDAS reports from 2016 through 2024 were fo[redacted] complaint types. (*Id.*). The MEC recommended a 90-day suspension on the purported grounds that Plaintiff's conduct negatively impacted patient care and quality of care and that Plaintiff was an "outlier" compared to other physicians. (See Exhibit 2, MEC Closing Statement filed under seal). Advocate never produced documents to allow Plaintiff to refute the "outlier" allegation and continues to refuse to produce the information in this litigation.

Plaintiff claims that her referral to the PQSC, PLC, and MEC for disciplinary review and the subsequent suspension of her privileges and termination of her contract based on the 19 MIDAS reports were discriminatory and retaliatory. Plaintiff seeks discovery to prove disparate treatment in these decisions and to rebut Advocate's claim that she was an "outlier," including documents showing:

(1) Other physicians outside her protected classes who had multiple MIDAS patient safety complaints during the relevant period were not referred to the disciplinary committees for review; and

(2) Other physicians outside her protected classes who were referred to the disciplinary committees based on multiple patient safety complaints were treated more favorably and disciplined less harshly by the review committees. In this regard, the disciplinary review committees are the relevant decision-makers, not just Drs. Multack and Anoina.

**B. Advocate's Proposal Is Overly Restrictive And Excludes Highly Relevant Information**

Advocate's proposal, which limits "comparator" discovery to physicians in the same

classification who engaged in the same (undefined) conduct as Plaintiff's complained-of conduct, and where Drs. Multack and Anoina were decision-makers, is overly narrow and excludes relevant information. All physicians were subject to the same conduct policies and review process by the PQSC, PLC, MEC, and other review committees under the Medical Bylaws. Advocate has provided no basis for limiting discovery to physicians in a particular "classification" or to decisions made by Drs. Multack and Anoina, since the review committees were also relevant decision-makers. Nor has Advocate defined the scope of "comparable" conduct or how it searched for physicians who engaged in comparable conduct. [redacted] (See Exhibit 1). Accordingly, at a minimum, Plaintiff should be entitled to discover information on the number of [redacted] complaints filed against other Trinity and South Suburban physicians and what, if any, disciplinary reviews or actions were taken against those physicians who had multiple complaints.

1. Advocate's Proposal Excludes Relevant Discovery

Advocate's proposal excludes highly relevant discovery, as evidenced by [redacted] The 2022 MIDAS report spreadsheet shows that [redacted] and the report does not even cover the entire year. It is inconceivable that there are only [redacted] complaints, and Advocate's own production reveals the deficiencies in its initial comparator production.

a. <u>Disciplinary Review Meeting Minutes and Presentation Materials</u>

For example, PQSC meeting minutes refer to [redacted] (Exhibit 3, AH48088-9 and AH48198-9, filed under seal). Advocate unredacted information for [redacted] (*Id.*). These same PQSC meeting minutes also reference an [redacted] (*See id.*). This critical information reveals that the PQSC was [redacted], who are clear potential comparators, yet Advocate has refused to produce the information. Advocate continues to redact the names and information of physicians who appeared before the PQSC and other disciplinary committees for multiple behavior complaints (*Id.; see also* Exhibit 4, AH48204, AH48215, AH48246, and AH48250, filed under seal). This information is highly relevant to Plaintiff's discrimination and retaliation claims. The PQSC is a relevant decision-maker in this case, and information on how it (and the PLC, MEC and other review committees) treated other physicians who appeared before it for multiple behavior, communication, or coordination-of-care related complaints is critical to demonstrating disparate treatment.

Other documents evidence the insufficiency of Advocate's comparator production. For example, Advocate produced PQSC agendas that reveal the names of [redacted] (*See, e.g.,* Exhibit 5 at Advocate 8024, 8035, 8048, 8050, 8062, 8079, 8086, 8097 filed under seal). For example:

- Advocate 8024 reflects an [redacted]
- Advocate 8035 refers to [redacted]
- [redacted] Advocate 8048 refers to an agenda item for [redacted]
- Advocate 8050 contains a [redacted]
- Advocate 8062 contains [redacted]
- Advocate 8079 and 8086 contain [redacted]
- [redacted] Advocate 8097 lists an [redacted]

Although Advocate produced the agendas for these meetings, it has continued to redact all information from the meeting minutes and presentation materials regarding these physicians, except for the physician designated as [redacted].[5] *See e.g.,* redacted meeting minutes included in Exhibits 3 and 4.[6] Information relating to the complaints filed against these other physicians and how the review committees treated them is crucial to proving Plaintiff's disparate treatment claims, especially since Advocate claims Plaintiff was an "outlier."

b. Spreadsheets and Other Reports

Advocate produced email exchanges between Hospital leadership and/or disciplinary

[4] Plaintiff uses the first letter of the physicians' last names to preserve confidentiality.
[5] While Advocate produced complaint information [redacted], it has not produced information on what, if any, disciplinary review or actions were taken against these physicians. The only unredacted disciplinary review information [redacted].
[6] Other redacted presentation materials are identified in Plaintiff's January 26, 2026, discovery letter attached as Exhibit to the Motion to Compel ("Plaintiff's Discovery Letter"). *See, e.g.*, AH 8718-8735. Physician Leadership Committee (PLC) and MEC meeting minutes are also redacted. *E.g.,* AH 42437-42.

committee members with attached [redacted] Advocate initially redacted all entries except those for Plaintiff. Its most recent production remains heavily redacted and includes only limited information for [redacted] These reports should be produced in a fully unredacted format. They are highly relevant to proving disparate treatment and pretext. [redacted] and relate to potentially comparable physicians and conduct.

For example:

[redacted] AH27694-6 is an email from Advocate's Patient Safety Manager to Defendant Multack with attachments titled [redacted] Event], *PQSC Behavior Related Physician Attributed PSE Escalation Process*, *Copy* [redacted]. Advocate failed to produce all the attachments, and the attachments it did produce were heavily redacted except for the lines related to Plaintiff. (*See* Exhibit 6 filed under seal). The attachments include [redacted] (*Id.*). Advocate's latest production unredacted some information [redacted], but the spreadsheets remain largely redacted. (See

Exhibits 7-8, AH48148 and AH48149 filed under seal). Information about other physicians who appeared before the PQSC multiple times and how they were treated is critical to Plaintiff's disparate treatment claim and to refuting Advocate's allegation that she was an "outlier." Information on how the hospital and disciplinary committees tracked and audited physician patient safety complaints is relevant to whether Plaintiff was treated consistently.

- AH8692, 8695, and 8910 are emails sent by the Patient Safety Manager to President Michelle Blakely, with a copy to Defendant Multack (among others), [redacted] The spreadsheets are redacted except for one entry relating to Plaintiff. (*See* Exhibits 9-11 filed under seal).[7]

- AH14158 is an email from the Patient Safety Manager to President Blakely with attached [redacted]. The [redacted] attachment is mostly redacted, other than a few line entries relating to Plaintiff. (*See* Exhibit 12 filed under seal). AH27692 is an email from an Advocate supervisor to Defendant Multack, among others, [redacted] The attached spreadsheet is redacted other than the line for Plaintiff. (*See* Exhibit 13 filed under seal; *see also* Exhibit 14 filed under seal (AH28137, a redacted spreadsheet of provider suspensions)). Information about events filed against other OB MDs, and other physicians who were suspended or were pending suspension is relevant to whether Plaintiff was treated differently in her review and discipline.

- AH35919 is a partially redacted spreadsheet [redacted] and AH48272 includes a heavily redacted

[7] Plaintiff provides only a few examples in this Joint Status Report. Other similar heavily redacted reports are identified by Bates number in Plaintiff's Discovery Letter.

spreadsheet [redacted].” (*See* Exhibits 15 and 16 filed under seal). This chart shows [redacted]. (Exhibit 16). Information about behavior events filed against other Trinity and South Suburban physicians, including OB MDs, is directly relevant to proving disparate treatment. There is simply no basis for Advocate to withhold this critical information.

**C. Plaintiff's Proposal For Additional Potential Comparators Discovery.**

As detailed above, the limitations imposed by Advocate's discovery proposal prevent the Plaintiff from discovering essential evidence relevant to proving her claims and rebutting Advocate's assertion that the disciplinary review and suspension were appropriate because she was an “outlier” compared to other physicians. (See Exhibit 2). At this discovery phase, Plaintiff should be entitled to discovery on *potentially* similarly situated employees, and Advocate should not have carte blanche to decide unilaterally who is a comparator. (Motion to Compel, Dkt. 118, at pp. 9-11). Further, at this discovery stage, the Court need not assess who would be an admissible comparator at trial as proposed by Advocate below.

After review and consideration of the initial comparator discovery, Plaintiff seeks an order compelling production of the following comparator discovery:

(1) Unredacted documents that refer to or relate to the number of [redacted] complaints filed against physicians who worked at Trinity and South Suburban Hospitals during the relevant period (2016-2024), including the unredacted [redacted] spreadsheets for these two complaint types and the unredacted specific spreadsheets and attachments referenced in this Joint Status Report. This information is relevant to showing

whether other physicians who had multiple complaints of the same complaint types filed against them were treated more favorably than Plaintiff, either by not being referred for review or by being disciplined less harshly during review.

(2) Documents relating to physicians who appeared before the PQSC, PLC, MEC, Appellate Review Committee ("ARC") or Governing Council ("GC") for review based on [redacted] complaints, from 2016 through 2024, and to any disciplinary reviews and actions taken against them. This includes the production of unredacted [redacted], and documents related to the review process and any adverse actions taken against such physicians.

(3) Documents responsive to Second Request for Production Number 7, *limited to* [redacted] MIDAS reports. For all physicians with more than three (3) [redacted] MIDAS reports or complaints, Plaintiff seeks the production of copies of those reports/complaints and all documents and communications relating to any investigation of the physician's conduct and any disciplinary review and actions taken against the physician.

(4) Documents showing what, if any, disciplinary reviews and actions were taken against [redacted]. This includes unredacted [redacted], and other documents showing what, if any, disciplinary reviews and actions were taken against [redacted]. Advocate's initial production did not include this information.

(5) Complete and unredacted copies of the specific documents identified in the Plaintiff's Motion to Compel at Exhibit 3 and in this Joint Status Report, as limited herein,

including unredacted copies of all attachments to AH27694-6.

(6) Complete and unredacted copies of [redacted] against Trinity or South Suburban physicians for the period 2016 to 2024. [redacted] but the reports have not been produced in unredacted format.

(7) Information on the race/color of [redacted]

(8) MIDAS reports for Plaintiff in the same format produced for the [redacted]

This information is not overly burdensome for Advocate to produce; most of it has already been gathered and is primarily contained in existing redacted reports and documents. The only other objections Advocate has raised are confidentiality and privilege. Confidentiality is protected through the Agreed Protective Order, and the privilege objections are unfounded. Now that Advocate has finally produced a complete privilege log identifying which documents it is withholding on the grounds of privilege, Plaintiff will file a separate motion to compel demonstrating that there is no basis to withhold the documents subject to this motion. Advocate failed to produce its log until April 22, 2026, so it should not be heard to complain (as it does below) about Plaintiff's failure to formally contest those assertions with cited authority.

## III. PLAINTIFF'S SECTION: REMAINING UNRESOLVED ISSUES IN THE MOTION TO COMPEL

### A. Documents Regarding Other Physicians' Allegations of Racist and Discriminatory Behavior.

Plaintiff continues to seek an order compelling Advocate to produce documents relating to the allegations of racist and discriminatory conduct made by other physicians as referenced in the June 25, 2020, email attached as Exhibit 5 to the Motion to Compel. (*See* Dkt. 118, at pp. 8-9, 12-

13).

**B. Production of a Complete Privilege Log**.

Plaintiff's Motion to Compel requested an order compelling Advocate to produce a complete privilege log with all privilege assertions. (Dkt. 118, at pp. 13-14). On April 22, 2026, Advocate produced a Privilege Log for Redacted ESI. Plaintiff's counsel is still reviewing that privilege log but notes that many of the privilege assertions are legally unsound. Plaintiff will file a separate motion to address those matters.

## VI. DEFENDANT'S SECTION: ADVOCATE'S POSITION

Advocate contends that it has fully complied with the Court's Order for the production of alleged comparator data and a privilege log. Advocate expressly stated in its cover letter to Plaintiff on April 22, 2026:

> Advocate restates its objections to Plaintiff's discovery requests regarding the production of patient safety event ("PSE") data. Such information is highly protected pursuant to the Federal Patient Safety and Quality Improvement Act of 2005, the Illinois Medical Studies Act, and the Wisconsin Quality Improvement Act. The strict confidentiality afforded to the reporting on near misses, medical errors, and adverse events pursuant to the stated Acts is essential to Advocate's success in obtaining compliance from its teammates in regular reporting on PSEs. Moreover, the goals of improving healthcare quality and preventing patient harm far outweigh any individual's right to access such secure data for purposes of a civil lawsuit. Further objecting with particularity, following its due diligent search and evaluation of its files, Advocate has not located *any* physicians who are similarly situated to Dr. Cothran.
>
> . . .
>
> Advocate firmly states that its supplemental production as described above should in no way be considered an admission by Advocate that [redacted] are similarly situated to Dr. Cothran. Advocate denies that it possesses data for a physician that is similarly situated to Dr. Cothran as such term is understood under Illinois and Seventh Circuit precedent.

As set forth in Advocate's Response in Opposition to Plaintiff's Motion to Compel (Dkt. # 120), Plaintiff has not cited any precedent to support her request for unfettered access to the

highly confidential and privileged patient safety report data protected under State and Federal law. At a minimum, Advocate respectfully requests that this Court first determine whether the alleged comparator data produced to date reveals that [redacted] are indeed "similarly situated" to the Plaintiff such that Plaintiff is even entitled to the substantial amount of supplemental discovery she is requesting. This can be achieved through the following: (1) comparing [redacted] against Plaintiff's "MIDAS" reports to assess the nature of the complained-of behavior; and (2) reviewing the transcript from Plaintiff's Fair Hearing in November, 2024. This latter documentation is critical in explaining a material factor that Plaintiff continues to overlook. It was not simply the number of "MIDAS" reports filed against Plaintiff that led to her suspension (though her 19 reports do make her an outlier); it was her failure, over multiple years, to acknowledge her inappropriate behavior or make any effort to correct it in compliance with Advocate's standards. For this reason, Plaintiff's blind reliance on the *number* of "MIDAS" reports entered against another physician and/or the *category* of the reported conduct [redacted] as sufficient to make said physician "similarly situated" to Plaintiff is factually inaccurate and would expand discovery beyond the bounds of the Federal Rules and relevant precedent.

"If You Give A Mouse A Cookie" continues to be the best way to explain Plaintiff's discovery conduct. Less than 24 hours after receiving Advocate's comparable data production, Plaintiff emailed defense counsel a "preliminary" comprehensive list of additional inquiries and requests for supplement. (Exhibit 17)[8]. Plaintiff requested a response to the inquiries by Monday (i.e., within 2 business days) and indicated that more requests may be forthcoming. *Id.* Written discovery closed on January 30, 2026. (Dkt. # 97). Moreover, Advocate's compliance with the

[8] The redacted version of Exhibit 17 is attached and an unredacted version will be filed under seal.

Court's discovery deadline took the full amount of time anticipated, requested and approved (30 days). Advocate's investigation, analysis and production of data involved considerable efforts across multiple departments internal to Advocate in addition to defense counsel's multiple hours of review. Plaintiff's bald contention that her demand for even more data on [redacted] *and beyond* will not cause an undue burden on Advocate is flatly wrong.

Plaintiff's Motion to Compel and supplemental demands for additional discovery as set forth above are based on Plaintiff's unsubstantiated speculation that underlies her entire cause of action. Advocate has exhibited good faith and due diligence in complying with the Court's Order, and the fact that Plaintiff has not located her smoking gun is not a sound basis for the supplemental discovery (and proverbial fishing expedition) that she is requesting. At bottom, Plaintiff's requests are not proportional to the needs of the case nor likely to lead to the discovery of information relevant to the claims and defenses. The undue burden caused by Plaintiff's insatiable appetite for more and more information must be denied at some point if this case has any hopes of progressing forward.

To wit, the parties have begun to schedule depositions to commence in May, but defense counsel has considerable concerns with proceeding forward with producing *any* Defendants or Advocate witnesses if Plaintiff's Motion to Compel is granted. Plaintiff's counsel has proposed June dates for Plaintiff's deposition. . Given the complex nature of her claims, producing the Defendants and Advocate witnesses prior to Plaintiff's testimony is unduly prejudicial to Defendants. Particularly given the number of recent amendments to Plaintiff's pleading, Defendants require Plaintiff's deposition testimony in order to have a fair and complete understanding of the allegations and claims that they are being called to defend against. Further, defense counsel find it highly likely that Plaintiff would demand to re-depose certain Defendants

or Advocate witnesses if Advocate is required to continue supplementing its production, as Plaintiff has shown a capacity to draw unsubstantiated conclusions from disclosures.

In the interests of progressing the case forward and ending the discovery abuses, Plaintiff's Motion to Compel and above-stated requests should be denied.

April 27, 2026

Respectfully submitted,

/s/ _*Kristi Nelson*_____________________________
One of the Attorneys for Plaintiff

Lori E. Lightfoot
Lightfoot & Associates, P.C.
3434 W. Wrightwood
Chicago, Illinois 60647
(312) 753-8207
mll56@ltwstrategies.com

Kristi Nelson
Nancy A. Temple
Katten & Temple, LLP
209 S. LaSalle Street, Suite 950
Chicago, IL 60604
(312) 663-0800
knelson@kattentemple.com
ntemple@kattentemple.com

/s/ __*Danessa Watkins*________________
One of the Attorneys for Defendants

Heather A. Bailey
Danessa Page Watkins
Ryan L. Young
AMUNDSEN DAVIS, LLC
150 N. Michigan Avenue, Suite 3300
Chicago, IL 60601
(312) 894-3364
hbailey@amundsendavislaw.com
dwatkins@amundsendavislaw.com
ryoung@amundsendavislaw.com

Peter E. Hansen
Amundsen Davis, LLC

3815 E. Main Street, Suite A-1
St. Charles, IL 60174
(630) 587-7971
phansen@amundsendavislaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2026, a true and complete copy of the foregoing **JOINT STATUS REPORT** was electronically filed and served electronically upon all counsel of record via email generated by the Court's CM/ECF system.

/s/ Kristi Nelson ________________
One of the Attorneys for Plaintiff

Lori E. Lightfoot
Lightfoot & Associates, P.C.
3434 W. Wrightwood
Chicago, Illinois 60647
(312) 753-8207
mll56@ltwstrategies.com

Nancy A. Temple
Kristi Nelson
Katten & Temple, LLP
209 S. LaSalle Street, Suite 950
Chicago, IL 60604
(312) 663-0800
ntemple@kattentemple.com
knelson@kattentemple.com